ABDIEL T. LEWIS (Cal. Bar No. 339339)
EVAN ROSE (Cal. Bar No. 253478)
Federal Trade Commission
Western Region San Francisco
90 7th St., Suite 14-300
San Francisco, CA 94103
alewis4@ftc.gov, erose@ftc.gov
Tel.: (415) 848-5100; Fax: (415) 848-5184

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　　Plaintiff,<br><br>　　　　　v.<br><br>PRECISION PATIENT OUTCOMES, INC.,<br>　　a corporation; and<br><br>MARGRETT PRIEST LEWIS,<br>　　individually and as CEO of Precision<br>　　Patient Outcomes, Inc.,<br><br>　　　Defendants. | Case No. 3:22-cv-7307-VC<br><br>**FTC'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing<br>Date:　　　March 16, 2023<br>Time:　　　10:00 a.m.<br>Location:　Zoom Webinar |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ............................................................................................ 1

II.  ARGUMENT ................................................................................................... 1

    A.  The FTC has constitutionally valid authority to bring this action ................................. 1

    B.  The COVID Resist allegations in the Complaint are well pled ................................. 5

    C.  The particularity in the Complaint far exceeds the requirements of Rule 9(b) ............. 7

    D.  The Complaint meets the requirements of Section 13(b) ............................................ 10

    E.  The FTC has well-established authority over dietary supplements ............................ 12

III.  CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton*,
  521 U.S. 203 (1997)..................................................................................... 2

*Bowsher v. Synar*,
  478 U.S. 714 (1986)..................................................................................... 2

*Bristol-Myers Co. v. FTC*,
  738 F.2d 554 (2d Cir. 1984), *cert. denied*, 469 U.S. 1189 (1985)............................................ 13

*Cody v. Kijakazi*,
  48 F.4th 956 (9th Cir. 2022) ........................................................................ 2

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021)............................................................................. 2, 5

*Daniel Chapter One v. FTC*,
  405 F. App'x 505 (D.C. Cir. 2010)............................................................. 15

*Decker v. Glenfed, Inc.*,
  42 F.3d 1541 (9th Cir. 1994) ...................................................................... 9

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)........................................................................... 2, 3, 4

*Freytag v. Comm'r*,
  501 U.S. 868 (1991)..................................................................................... 3

*FTC v. D-Link Sys., Inc.*,
  No. 3:17-CV-00039-JD, 2017 WL 4150873 (N.D. Cal. Sept. 19, 2017) ........................... 7, 8, 9

*FTC v. Elec. Payment Solutions of Am. Inc.*,
  No. CV-17-02535, 2019 WL 4287298 (D. Ariz. Aug. 28, 2019)...................................... 11, 12

*FTC v. Evans Products Co.*,
  775 F.2d 1094 (9th Cir. 1985) ............................................................... 10, 11

*FTC v. Figgie Int'l, Inc.*,
  994 F.2d 595 (9th Cir. 1993) ...................................................................... 7

*FTC v. Freecom Comms., Inc.*,
  401 F.3d 1192 (10th Cir. 2005) ................................................................... 7

*FTC v. Golden Sunrise Nutraceutical, Inc.*,
  No. 1:20-cv-01060-DAD-SKO, 2020 WL 4501968 (E.D. Cal. Aug. 5, 2020) ........................ 6

*FTC v. Lights of America, Inc.*,
  760 F. Supp. 2d 848 (C.D. Cal. 2010) ................................................................... 9

*FTC v. Lunada Biomedical, Inc.*,
  No. CV-15-3380-MWF, 2015 WL 12911515 (C.D. Cal. Sept. 23, 2015) ............................. 13

*FTC v. Medlab, Inc.*,
  615 F. Supp. 2d 1068 (N.D. Cal. 2009) ................................................................ 12

*FTC v. Pantron I Corp.*,
  33 F.3d 1088 (9th Cir. 1994) ........................................................................ 6

*FTC v. Roomster Corp.*,
  No. 22-cv-7389-CM, 2023 U.S. Dist. LEXIS 17138 (S.D.N.Y. Feb. 1, 2023) .................... 2, 5

*FTC v. Sage Seminars, Inc.*,
  No. C-95-2854 SBA, 1995 WL 798938 (N.D. Cal. Nov. 2, 1995) ......................................... 11

*FTC v. Shire ViroPharma, Inc.*,
  917 F.3d 147 (3d Cir. 2019) .......................................................................... 11

*FTC v. Texaco, Inc.*,
  555 F.2d 862 (D.C. Cir. 1977) ....................................................................... 14

*FTC v. Wellness Support Network, Inc.*,
  No. 10-cv-04879-JCS, 2014 WL 644749 (N.D. Cal. Feb. 19, 2014) ...................... 6, 12, 13, 15

*Humphrey's Ex'r v. United States*,
  295 U.S. 602 (1935) .............................................................................. 2, 3, 4, 5

*In re Aiken Cnty.*,
  645 F.3d 428 (D.C. Cir. 2011) ....................................................................... 2, 3

*In re Pfizer, Inc.*,
  1972 WL 127465 (F.T.C. 1972) ........................................................................ 15

*In re POM Wonderful LLC*,
  2013 WL 8364895 (F.T.C. 2013), *order modified & petition for review denied*,
  777 F.3d 478 (D.C. Cir. 2015) ....................................................................... 15

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) ................................................................................ 2

*Mistretta v. United States*,
   488 U.S. 361 (1989)......................................................................................................... 2

*Moore v. Kayport Package Express, Inc.*,
   885 F.2d 531 (9th Cir. 1989) ......................................................................................... 8

*Morrison v. Olson*,
   487 U.S. 654 (1988).......................................................................................... 2, 3, 4, 5

*PHH Corp. v. CFPB*,
   881 F.3d 75 (D.C. Cir. 2018) ......................................................................................... 3

*POM Wonderful, LLC v. FTC*,
   777 F.3d 478 (D.C. Cir. 2015), *cert. denied*, 548 U.S. 965 (2016) .................................... 14, 15

*Seila Law, LLC v. CFPB*,
   140 S. Ct. 2192 (2020)..................................................................................... 2, 3, 4, 5

*Sierra Pac. Res. v. El Paso Corp.*,
   250 F. App'x 776 (9th Cir. 2007) ................................................................................... 6

*Std. Oil. Co. of Cal. v. FTC*,
   596 F.2d 1381 (9th Cir. 1979), *rev'd on other grounds*, 449 U.S. 232 (1980)........................ 12

*Thompson Med. Co. v. FTC*,
   791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987) ................................. 13, 14

*United States v. Mylife.Com, Inc.*,
   499 F. Supp. 3d 757 (C.D. Cal. 2020) ......................................................................... 11

*United States v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016) ....................................................................................... 8

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ....................................................................................... 7

*Wiener v. United States*,
   357 U.S. 349 (1958)......................................................................................................... 2

## Statutes

31 U.S.C. §§ 1105(a)(21)(B), 1108 ................................................................................... 5

COVID-19 Consumer Protection Act, Consolidated Appropriations Act, Public
   Law 116-260, 134 Stat. 1182, Division FF, Title XIV, § 1401 (2021) ........................... 1, 7, 10

FTC Act, Section 5, 15 U.S.C. § 45.................................................................. 1, 7, 9, 10, 12

FTC Act, Section 12, 15 U.S.C. § 52.......................................................................... 1, 7, 12

FTC Act, Section 13(b), 15 U.S.C. § 53(b) ............................................................. 1, 4, 10

FTC Act, Section 16, 15 U.S.C. § 56 ................................................................................... 3

FTC Act, Section 19, 15 U.S.C. § 57b................................................................................. 1

FTC Act, Public Law 63-203, 38 Stat. 717, 720 (1914)..................................................... 4

FTC Act, Public Law 73-22 Chapter 38 § 20(b), 48 Stat. 74, 86 (1933)........................... 4

**Rules & Regulations**

16 C.F.R. § 0.8.................................................................................................................... 5

Fed. R. Civ. P. 9(b) ......................................................................................................... 7, 9

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .............................................................................................. 5

**Administrative Agency Materials**

FDA, *Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r)(6) of the Federal Food, Drug, and Cosmetic Act* (Jan. 2009), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food ............................................................................... 14, 15

FTC, *Dietary Supplements: An Advertising Guide for Industry* (1998), *available at* https://www.ftc.gov/system/files/documents/plain-language/bus09-dietary-supplements-advertising-guide-industry.pdf (Apr. 2001 reprint)................................ 12, 13, 15

FTC, *Health Products Compliance Guidance* (Dec. 2022), *available at* https://www.ftc.gov/business-guidance/resources/health-products-compliance-guidance ...... 13

Memorandum of Understanding Between Federal Trade Commission and the Food and Drug Administration, 36 Fed. Reg. 18539 (Sept. 16, 1971).................................... 14

**Articles**

K. Datla & R. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 806 (2013) .......................................................................... 5

## I.    INTRODUCTION

The Federal Trade Commission ("FTC") alleges that Defendants Precision Patient Outcomes, Inc. ("PPO") and Margrett Priest Lewis ("Lewis") (collectively, "Defendants") have violated the Federal Trade Commission Act ("FTC Act") and the COVID-19 Consumer Protection Act ("COVID-19 Act") by misrepresenting (a) that their dietary supplement, COVID Resist/VIRUS Resist, can treat, prevent, or mitigate COVID-19 and (b) that their health claims are scientifically proven.

Starting in May 2021, Defendants disseminated these deceptive advertisements on their websites and social media pages, including Facebook, Instagram, and TikTok. (Dkt. #21 ¶¶ 11, 23–24, 32–39, 41; Exs. 4–19, at 11–47). They lacked competent and reliable scientific evidence to support these claims. To ostensibly substantiate the efficacy of their product, they cherry-picked quotes from scientific studies, ignoring the studies' conclusions and limitations. (*Id.* ¶ 41). Despite receiving detailed information about the legal requirements for COVID-19 health claims directly from the FTC, Defendants continued to make deceptive claims for over a year, only ceasing their misconduct mere months before this suit was initiated. (*Id.* ¶¶ 16–22, 32–37).

On November 18, 2022, the FTC filed a two-count complaint under Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45, 52, and the COVID-19 Act, Section 1401, Division FF, of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260. (Dkt. #1). On January 13, 2023, the FTC filed its first amended complaint. (Dkt. #21) ("Complaint" or "FAC"). Pursuant to its statutory mandate, the FTC is seeking injunctive relief to protect consumers from Defendants' deceptive practices, as well as civil penalties for their past violations.

In their motion to dismiss (Dkt. #21) ("Motion"), Defendants advance a myriad of specious arguments regarding the sufficiency and legitimacy of the FTC's Complaint. These arguments lack sound legal and factual foundation, and Defendants' Motion should be denied.

## II.    ARGUMENT

### A.    The FTC has constitutionally valid authority to bring this action.

The FTC filed this case under express authority granted in Sections 13(b) and 19(a) of the FTC Act. 15 U.S.C. §§ 53(b), 57b(a). Defendants' contention that this authority violates

separation of powers principles must fail because it rests on a series of mistaken premises and, essentially, amounts to an attack on *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), a binding Supreme Court decision, which only that Court has the "prerogative of overruling." *See Agostini v. Felton*, 521 U.S. 203, 237 (1997). In *FTC v. Roomster Corp.*, a court considering the same argument concluded that the defendants had "grossly misinterpret[ed] binding Supreme Court precedent" and found that the FTC "clearly has the authority to bring [the] suit." No. 22-cv-7389-CM, 2023 U.S. Dist. LEXIS 17138, at *21–26 (S.D.N.Y. Feb. 1, 2023).

The Supreme Court held 88 years ago that Congress could, consistent with the Constitution, protect FTC Commissioners through a for-cause removal restriction. *Humphrey's Ex'r*, 295 U.S. at 632. Since then, the Court has addressed presidential removal power multiple times, and each time the Court has cited *Humphrey's Executor* and declined to overrule it. *See Collins v. Yellen*, 141 S. Ct. 1761, 1786–87 & n.21 (2021); *Seila Law, LLC v. CFPB*, 140 S. Ct. 2192, 2198–200 (2020); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010); *Mistretta v. United States*, 488 U.S. 361, 410–11, 423–24 (1989); *Morrison v. Olson*, 487 U.S. 654, 686–90, 706–07 (1988); *Bowsher v. Synar*, 478 U.S. 714, 724–26 (1986); *Wiener v. United States*, 357 U.S. 349, 353–54 (1958). As then-Judge Kavanaugh put it, "*Humphrey's Executor* is an entrenched Supreme Court precedent, protected by stare decisis." *In re Aiken Cnty.*, 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring).[1]

Both *Humphrey's Executor* itself and the Supreme Court's post-*Humphrey's Executor* decisions "identified several organizational features" of the FTC that render its removal restrictions constitutionally permissible. *See Seila Law*, 140 S. Ct. at 2198–99. The FTC is composed of five members, no more than three of which can be from the same political party, yielding a "nonpartisan," impartial body. *See Humphrey's Ex'r*, 295 U.S. at 624. The Commissioners serve staggered, seven-year terms, enabling them to develop "trained judgment" and expertise. *Id.* at 624–25. These features, which still characterize today's FTC, effectuated Congress's goal of creating a body of experts whose decision-making is informed by their

---

[1] Defendants' citations to *Lucia v. SEC*, 138 S. Ct. 2044 (2018), and *Cody v. Kijakazi*, 48 F.4th 956, 961 (9th Cir. 2022), are inapposite. (*See* Motion at 7). Both opinions concern appointments of Administrative Law Judges. *See Lucia*, 138 S. Ct. at 2049; *Cody*, 48 F.4th at 958.

experience and knowledge of the industries they regulate. *See id.* at 625–26. The Supreme Court has "bless[ed]" this bipartisan, multimember agency structure, *Free Enter. Fund*, 537 F.3d at 695 (Kavanaugh, J., dissenting), and Congress has established many other multimember expert bodies with similar enforcement powers and removal protections that are regarded as lawful. These include, for example, the Consumer Products Safety Commission, *see Morrison*, 487 U.S. at 724–25 (Scalia, J., dissenting), the Securities and Exchange Commission ("SEC"), *see Freytag v. Comm'r*, 501 U.S. 868, 916, 920 (1991) (Scalia, J., concurring), the National Labor Relations Board, *Aiken Cnty.*, 645 F.3d at 441 (Kavanaugh, J., concurring), and the Federal Energy Regulatory Commission, *PHH Corp. v. CFPB*, 881 F.3d 75, 164 (D.C. Cir. 2018) (Kavanaugh, J., dissenting).

By contrast, the Supreme Court has repeatedly distinguished the FTC's constitutionally permissible multimember structure from the constitutionally defective structures of agencies run by a single officer with removal protections. For instance, in *Seila Law*, the Court observed that the structure of the Consumer Financial Protection Bureau ("CFPB") "deviated from [that] of nearly every other independent administrative agency in our history," which was a "telling indication of a severe constitutional problem." 140 S. Ct. at 2191. It specifically contrasted the CFPB's structure with that of the FTC, which the Court described as "a traditional independent agenc[y] headed by a multimember . . . commission," comprised of a "body of experts" that is "non-partisan." *Id*. at 2192, 2200. Indeed, the Court suggested that Congress could remedy the CFPB's constitutional flaw by converting it to a multimember commission. *See id.* at 2211.

Defendants do not directly challenge *Humphrey's Executor*. Instead, they contend that Congress could not later constitutionally delegate executive law-enforcement powers to an agency whose members enjoy for-cause removal protection. (*See* Motion at 5–6). The argument rests on incorrect assumptions and is merely a thinly veiled attack on *Humphrey's Executor*.[2]

Defendants' argument proceeds from the premise that the Court in *Humphrey's Executor* considered an agency without authority to enforce the law. (*See id.* at 5). In reality, the FTC has

---

[2] Defendants also suggest that the Department of Justice ("DOJ") disapproves of this case because it did not commence the suit itself pursuant to 15 U.S.C. § 56(a)(1). (*See* Motion at 4). This inference is completely baseless, and Defendants cite no authority that says otherwise.

always had the authority to enforce the FTC Act, including in federal court, and the Supreme Court in *Humphrey's Executor* therefore approved of such authority even as it upheld the FTC's structure. As originally enacted in 1914, and as it was on the books in 1935 (and still today), the FTC Act "empowered and directed" the agency to "prevent" unfair methods of competition by enforcing the FTC Act in the FTC's administrative forum and to order violators to "cease and desist" from their unlawful conduct. *See* FTC Act, Pub. L. No. 63-203, 38 Stat. 717, 720 (1914). The FTC Act further granted the FTC power to enforce its cease-and-desist orders in federal courts of appeals and to defend those orders against challenge in the same courts. *Id*.[3] That Congress later expanded the FTC's enforcement power does not alter the basic constitutional calculus of *Humphrey's Executor*. That much is clear from the Supreme Court's recent decisions declining to overrule *Humphrey's Executor*, including in cases decided long after Congress conferred additional enforcement authority on the FTC.

Moreover, in considering constitutional restraints on the President's removal power, the Court did not conclude that Congress lacks constitutional authority to confer executive enforcement authority on a department head protected by for-cause removal protection. To the contrary, in *Seila Law*, the Court indicated that the CFPB, to which Congress had delegated extensive enforcement power, could be rendered constitutional by becoming a multimember commission (like the FTC). 140 S. Ct. at 2211.

In other words, the constitutional problem with single-member agencies exercising enforcement authority is not the authority itself, but restrictions on the President's power of removal. In *Free Enterprise Fund*, the Court declined to vacate an officer's regulatory authority on the ground that the authority "does not violate the separation of powers, but the substantive removal restrictions . . . do." 561 U.S. at 508–09. The Supreme Court has never suggested in the 88 years since *Humphrey's Executor* that enforcement authority by itself is subject to

---

[3] Additionally, in 1933, Congress granted the FTC the authority to enforce the Securities Act, which authorized the FTC to seek preliminary and permanent injunctions against violations in federal court, much like Section 13(b) does today. *See* Public Law 73-22 Chapter 38 § 20(b), 48 Stat. 74, 86 (1933). Congress later transferred that enforcement authority to the SEC, another multimember agency that exercises substantial enforcement authority and that would have been familiar to the Court that decided *Humphrey's Executor*.

constitutional restraint. Indeed, in *Morrison*, the Supreme Court upheld the grant of criminal

prosecution authority to an independent counsel not removeable at will by the President. 487

U.S. at 696–97. The Court later described *Morrison* as it having "[b]ack[ed] away from the

reliance in *Humphrey's Executor* on the concepts of 'quasi-legislative' and 'quasi-judicial'

power" in favor of examining "the ultimate question as whether a removal restriction is of such a

nature that it impedes the President's ability to perform his constitutional duty." *Seila Law*, 140

S. Ct. at 2199 (cleaned up); *see Morrison*, 487 U.S. at 689–90. The FTC's structure—which was

upheld in *Humphrey's Executor* and has not been substantially modified since—does not.[4]

    In any event, even if Defendants could successfully challenge the FTC Commissioners'

removal protection, that still would not invalidate this enforcement action. Because the FTC's

Commissioners were appointed consistent with the requirements of the Appointments Clause,

U.S. Const. art. II, § 2, cl. 2, even an unconstitutional removal restriction would provide "no

reason" to void their actions. *See Collins*, 141 S. Ct. at 1787. "Settled precedent . . . confirms that

the unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake

the . . . responsibilities of his office." *Id.* at 1787–88 & n.23; *Roomster*, 2023 U.S. Dist. LEXIS

17138, at *25 (citing *Collins*).

    **B.**    **The COVID Resist allegations in the Complaint are well pled.**

    The FTC has properly alleged that Defendants' advertising claims for COVID Resist

were deceptive in violation of Sections 5 and 12 of the FTC Act. To prove deception, the FTC

"must show that 1) there is a representation, omission or practice that 2) is likely to mislead

consumers acting reasonably under the circumstances, and 3) the representation, omission or

practice was material." *FTC v. Wellness Support Network, Inc.* ("*WSN*"), No. 10-cv-04879-JCS,

---

[4] The FTC is subject to a significant degree of presidential accountability. The President controls
the agency's budget, 31 U.S.C. §§ 1105(a)(21)(B), 1108, which has a "direct relation" to
policymaking. *See* K. Datla & R. Revesz, *Deconstructing Independent Agencies (and Executive
Agencies)*, 98 Cornell L. Rev. 769, 806 (2013). The President also selects the Chair, who serves
as the "executive and administrative head of the agency," 16 C.F.R. § 0.8, controls the agency's
expenditures, and selects the of heads of its major policy-making divisions. Furthermore, the
Commissioners' seven-year terms are staggered, enabling frequent presidential appointments,
which provide "the opportunity to shape [the agency's] leadership and thereby influence its
activities." *Cf. Seila Law*, 140 S. Ct. at 2204.

2014 WL 644749, at *10 (N.D. Cal. Feb. 19, 2014) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)). Also, on a motion to dismiss, courts must accept all allegations and reasonable inferences as true and construe allegations in the light most favorable to the non-moving party. *Sierra Pac. Res. v. El Paso Corp.*, 250 F. App'x 776, 777 (9th Cir. 2007).

The Complaint alleges that Defendants have represented (a) that COVID Resist treats, prevents, or mitigates COVID-19, and (b) that COVID Resist's efficacy is scientifically proven. (FAC ¶¶ 11, 32, 37–38). The allegations quote specific claims that Defendants made for COVID Resist (FAC ¶¶ 39.A–E), and COVID Resist marketing materials are attached as Exhibits (Exs. 4–5, at 11–13; Ex. 8, at 21; Exs. 13–14, at 35–37). Indeed, the very name of COVID Resist is an express claim of its efficacy. The Complaint alleges that these claims are false or unsubstantiated because "[t]here are no competent and reliable human clinical studies substantiating that COVID Resist/VIRUS Resist is effective in the treatment, prevention, or mitigation of COVID-19." (FAC ¶¶ 40–41).

Advertising claims are material if they "involve[] information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *WSN*, 2014 WL 644749, at *17 (quotation omitted). Express claims and "claims that significantly involve health [and] safety" are presumptively material. *Id.* (quotation omitted); *see also FTC v. Golden Sunrise Nutraceutical, Inc.*, No. 1:20-cv-01060-DAD-SKO, 2020 WL 4501968, at *6 (E.D. Cal. Aug. 5, 2020) (finding that the defendants' initial representations that expressly identified its product, Emergency D-Virus, as a COVID-19 treatment or cure were material). Here, the claims at issue are express and involve health and safety. For example, Defendants posted an image of a COVID Resist bottle on PPO's Facebook page next to an image of a medical facemask emblazoned with the words "WE WILL WIN." (FAC ¶ 39.C; Ex. 13, at 35).

Defendants assert that the FTC's claims related to COVID Resist must be dismissed because the Complaint does not allege actual sales of COVID Resist. (*See* Motion at 8).[5] In support, they fail to cite the well-accepted legal standard for deception quoted above, and instead

---

[5] Defendants also claim that the FTC does not allege that COVID Resist was "offered for sale" (*see* Motion at 8), but this is incorrect. (*See* FAC ¶¶ 11, 34; Ex. 5, at 13 (cart webpage)).

point to inapposite language from a criminal fraud case. (*See id.* at 8). The FTC Act is not a fraud statute because, among other things, reliance and consumer injury are not elements of a deception claim. *See FTC v. Freecom Comms., Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005).[6]

Similarly, Defendants miscite *FTC v. Figgie International, Inc.* for the proposition that the FTC "must show . . . that a product was actually purchased." (*See* Motion at 8). The Ninth Circuit actually held in *Figgie* that "there may be *no redress* without proof of injury." 994 F.2d 595, 605 (9th Cir. 1993) (emphasis added). In this case, however, the FTC is seeking civil penalties pursuant to the COVID-19 Act, not consumer redress. Moreover, Section 12 of the FTC Act specifically prohibits false advertising that "is *likely to induce* . . . the purchase . . . of food [or] drugs." 15 U.S.C. § 52 (emphasis added). In any event, it is reasonable to infer that Defendants' advertising claims for COVID Resist did lead to purchases of the same product under the VIRUS Resist label. As alleged in the Complaint, Defendants continued to disseminate claims for COVID Resist even after renaming the product. (FAC ¶¶ 34–35, 39; Ex. 9, at 27).

## C. The particularity in the Complaint far exceeds the requirements of Rule 9(b).

The FTC's Complaint lays out a precise timeline of relevant dates, specifies Defendants' roles in the challenged practices, directly quotes numerous deceptive claims from Defendants' marketing materials, attaches 17 screenshots of actual advertisements, and explains in detail why the claims are misleading. It easily surpasses the degree of particularity that Rule 9(b) requires for "the circumstances constituting fraud or mistake." *See* Fed. R. Civ. P. 9(b).

While Section 5 of the FTC Act is not a fraud statute, some courts have extended Rule 9(b) to Section 5 under the reasoning that allegations of false or misleading statements about a product "sound in fraud." *See FTC v. D-Link Sys., Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at \*2 (N.D. Cal. Sept. 19, 2017). To satisfy the requirements of Rule 9(b), the plaintiff must include the "who, what, when, where, and how" of the fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Complaints that contain "mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531,

---

[6] As discussed below, *see infra* Section III.C, some courts have held that Section 5 claims "sound in fraud" for the purposes of Rule 9(b).

540 (9th Cir. 1989).

For the "who" of the deception, the Complaint alleges that Defendant PPO "advertised, marketed, distributed, or sold dietary supplements, COVID Resist and/or VIRUS Resist," and that Defendant Margrett Priest Lewis formulated, directed, controlled, had the authority to control, or participated in the acts and practices of PPO. (FAC ¶¶ 8–9). If liability for corporate fraud is alleged against an individual defendant, "the allegations should include . . . , where possible, the roles of the individual defendants in the misrepresentations." *Moore*, 885 F.2d 531, 540. Accordingly, the Complaint alleges, among other things, that Lewis is PPO's co-founder, Chief Executive Officer, Chief Financial Officer, Director, and Secretary (FAC ¶ 9); that she was involved in all aspects of selling COVID Resist/VIRUS Resist to consumers throughout the United States, including labeling, advertising, marketing, and distribution (*id.*); and that she promoted the product on her personal social media pages. (*Id.* ¶¶ 38–39).

As for the "what" and "where," as summarized above, the Complaint contains direct quotes and examples of Defendants' deceptive claims and includes 17 Exhibits containing screenshots of Defendants' deceptive advertising to consumers on their website and social media pages. (*Id.* ¶¶ 39, 41; Exs. 3–19, at 9–47). Defendants suggest "putting aside" paragraphs 39–41 of the Complaint, s*ee* Motion at 10, but supply no reason why the Court should ignore these allegations, which span eight pages and (along with the Exhibits) form the factual core of the Complaint.

As for "when" the claims were made, "a complaint need not allege a precise time frame, describe in detail a single specific transaction or identify the precise method used to carry out the fraud." *D-Link Sys.*, 2017 WL 4150873, at *3 (internal quotes omitted); *see also United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (finding complaint had a strong factual basis where plaintiffs alleged a two-year timeframe for defendant's conduct). In *D-Link*, it was sufficient that the FTC identified the time period in which the defendants made statements. *Id.* Here, the Complaint does just that, laying out a comprehensive timeline of Defendants' deceptive conduct. The FTC alleges that between May 2021 and June 2022, Defendants advertised, marketed, and offered for sale or sold COVID Resist/VIRUS Resist on their websites.

(FAC ¶¶ 11, 24, 35). The Complaint further alleges that during this time, PPO promoted the product on its social media pages, including Facebook, Instagram, and TikTok. (*Id.* ¶ 37). The Complaint also includes screenshots of the claims Defendants made on their website and social media pages, specifying the date the captures were made and the dates Defendants posted their claims on social media. (*Id.* ¶ 39; Exs. 4–6, at 11–15; Ex. 9, at 27; Exs. 13–19, at 35–47).

For the "why," "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." *Decker v. Glenfed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994). The Complaint clearly explains that Defendants had no competent and reliable scientific evidence to substantiate their claims about the efficacy of their product. (FAC ¶ 40). Defendants cited to several scientific studies and articles to corroborate their efficacy claims, but completely disregarded the conclusions and limitations of these studies. (*Id.* ¶ 41). Defendants cherry-picked portions of the studies, relying on them to make deceptive claims about the product's effectiveness in preventing, treating, and mitigating COVID-19. (*Id.*). Further, the Complaint provides several examples of the scientific limitations that Defendants ignored. (*Id.*).

Defendants also argue that the FTC's Complaint does not allege sufficient facts to show "justifiable reliance" or "resulting damage." (*See* Motion at 10). However, while eventual liability depends on whether the conduct was likely to mislead reasonable consumers, "at this stage, the FTC simply needs to allege particularized facts leading to a plausible inference of liability." *D-Link Sys.*, 2017 WL 4150873, at *3. Additionally, as noted above, *see supra* Section II.B, consumer injury is not an element of deception under Section 5.

Defendants cite *FTC v. Lights of America, Inc.* in support of their position but misconstrue the holding. The court referred to reliance and damage only in concluding that Rule 9(b) should apply to the FTC's complaint, not in evaluating the complaint's fitness under the Rule. 760 F. Supp. 2d at 848, 853–54 (C.D. Cal. 2010). The complaint ultimately failed because the allegations did not "differentiate between conduct committed by [the various defendants], nor [did] they explain when or where the alleged misrepresentations were made." *Id.* at 854–55. As detailed above, the FTC's Complaint in this matter has no such deficiencies.

Last, Defendants assert that Rule 9(b) requires the FTC to allege how many violations

occurred, for the purpose of calculating civil penalties. (*See* Motion at 10). They cite no authority for this proposition. The number of violations and other related factors that go to calculating an appropriate civil penalty figure, *see* 15 U.S.C. § 45(m)(1)(C), are properly matters for discovery.

      **D.**      **The Complaint meets the requirements of Section 13(b).**

The allegations in the Complaint are more than sufficient to support an action seeking injunctive relief under Section 13(b) of the FTC Act. Section 13(b) authorizes the FTC to file suit when it "has reason to believe" that a defendant "is violating, or is about to violate, any provision of law enforced by the [FTC]." 15 U.S.C. § 53(b). Consistent with this requirement, the Complaint is replete with allegations supporting a reason to believe that Defendants are about to violate the FTC Act. First and foremost, a broad set of allegations establish that Defendants engaged in a pattern of misconduct that lasted more than a year, despite receiving information directly from the FTC about the legal requirements for making COVID-19 health claims.

In May 2021, in a detailed letter responding to Defendants' inquiry, the FTC directed Defendants to relevant guidance materials, including the FTC's advertising guide for dietary supplements, and informed Defendants about warning letters the FTC had issued to marketers of COVID-19 products and an enforcement action under the COVID-19 Act that the FTC had taken related to a product with ingredients found in Defendants' products. (FAC ¶¶ 16–22). In response, Defendants merely changed the name of their product from COVID Resist to VIRUS Resist and continued to make violative advertising claims. (*Id.* ¶¶ 23–25).

In fact, even after purportedly moving on to VIRUS Resist, Defendants failed to remove all advertising for COVID Resist. The FTC captured claims for COVID Resist on October 4, 2021 (*id.* ¶¶ 34–35; Ex. 5, at 13; Ex. 8, at 21) and January 7, 2022 (*id.* Exs. 13–14, at 35–37). The violations continued until June 2022, lasting more than a year in total. (*Id.* ¶¶ 32–37).

Additionally, Defendants are more than capable of returning immediately to their violative advertising claims. In *FTC v. Evans Products Co.*, the seminal Ninth Circuit opinion on likelihood of recurrence in FTC cases, the court held that the alleged violations were not likely to recur because, among other things, the defendant corporation had ceased the challenged practices years before the FTC filed its complaint and had recently filed for bankruptcy. 775 F.2d 1084,

1088 (9th Cir. 1985). Here, however, Defendants ceased their violations only a few months before the FTC filed its Complaint, and corporate Defendant PPO remains in business. (FAC ¶¶ 8, 37). Moreover, PPO is under the continued ownership and control by the named individual Defendant. (*Id.* ¶ 9). It is reasonable to infer that the individual Defendant—who was "involved in all aspects of offering the sale of or selling COVID Resist and VIRUS Resist" (*id.*)—intends to continue in the dietary supplement business. *See FTC v. Elec. Payment Solutions of Am. Inc.*, No. CV-17-02535, 2019 WL 4287298, at *10 (D. Ariz. Aug. 28, 2019) (holding that "the FTC has sufficiently pled a reasonable belief that [the defendants'] past wrongs are likely to recur because [they] remain in the same professional occupation").

Defendants acknowledge that *Evans* is the controlling law in the Ninth Circuit, but nevertheless gesture at the more-stringent standard set out by the Third Circuit in *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019). (*See* Motion at 11). However, "even if *Shire ViroPharma* governed cases in Ninth Circuit district courts—which it does not—it is distinguishable on its facts." *See United States v. Mylife.Com, Inc.*, 499 F. Supp. 3d 757, 767 (C.D. Cal. 2020). In *Shire ViroPharma*, "the FTC sued five years after a drug manufacturer ceased its allegedly illegal conduct and two years after the manufacturer had divested itself of the drug." *Id.* Again, the gap between Defendants' illegal conduct and the Complaint is merely a few months, and there is no basis for concluding that Defendants are unable to resume sales of COVID Resist/VIRUS Resist in the absence of injunctive relief.

Moreover, when Defendants cease violations only after notice of government inquiry, courts routinely treat the violations as if they never stopped or are imminently about to recur. *MyLife.Com, Inc.*, 499 F. Supp. 3d at 767; *see also Elec. Payment Solutions*, 2019 WL 4287298, at *9 ("[C]ourts should be wary of a defendant's termination of illegal conduct when a defendant voluntarily ceases unlawful conduct in anticipation of formal intervention."); *FTC v. Sage Seminars, Inc.*, No. C-95-2854 SBA, 1995 WL 798938, at *6 (N.D. Cal. Nov. 2, 1995) (noting that the "claimed cessation of conduct occurred only *after* defendants learned that the FTC had commenced an investigation . . . [so] any cessation on the part of defendants can hardly be considered 'voluntary'") (internal citations omitted). It is reasonable to infer from the Complaint

that Defendants ceased their misconduct only after becoming aware of the FTC's pre-complaint investigation. As noted above, despite marketing VIRUS Resist for more than a year, Defendants ceased their violations mere months before the FTC filed suit. *See Elec. Payment Solutions*, 2019 WL 4287298, at *9 ("Because the FTC's prosecution . . . also occurred in [the same year the defendants ceased their alleged unlawful conduct], the Court finds it reasonable to infer that the defendants' cessation took place in response to the FTC's litigation.").

Finally, the FTC should be granted significant discretion in determining whether a defendant is violating or is about to violate the law. The Ninth Circuit has held that the same "reason to believe" language in another part of the FTC Act, Section 5(b), requires only that the FTC allege a valid factual basis to support its belief that violations are occurring or are about to occur. *See Std. Oil. Co. of Cal. v. FTC*, 596 F.2d 1381, 1386 (9th Cir. 1979) (holding that complaint issued due to, e.g., "outside pressures" would violate Section 5(b)), *rev'd on other grounds*, 449 U.S. 232 (1980). As detailed above, there is a sound factual basis for the FTC to have found a reason to believe that Defendants were violating or were about to violate the law.

### E.      The FTC has well-established authority over dietary supplements.

The FTC is empowered to bring cases targeting deceptive advertising claims for dietary supplements under Section 12 of the FTC Act, prohibiting the dissemination of false ads "for the purpose inducing, or which [are] likely to induce . . . the purchase . . . of food [or] drugs," as well as under the general prohibition against deceptive acts and practices in Section 5. 15 U.S.C. §§ 45, 52. Consistent with this statutory mandate, the FTC has an extensive history of bringing dietary supplement cases, including in this District. *See, e.g.*, *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009) (deceptive advertising for weight-loss supplement); *WSN*, 2014 WL 644749 (deceptive advertising for diabetes treatment supplement).

More than two decades ago, the FTC issued a definitive guide on dietary supplement advertising. FTC, *Dietary Supplements: An Advertising Guide for Industry* (1998) ("1998 FTC Guide").[7] Since the guide was initially issued (according to the recently revised version), "the

---

[7] https://www.ftc.gov/system/files/documents/plain-language/bus09-dietary-supplements-advertising-guide-industry.pdf (Apr. 2001 reprint)

FTC has settled or adjudicated more than 200 cases involving false or misleading advertising claims about the benefits or safety of dietary supplements or other health-related products, including foods, over-the-counter (OTC) drugs, homeopathic products, health equipment, diagnostic tests, and health-related apps." FTC, *Health Products Compliance Guidance* (2022).[8]

Despite this longstanding and well-established legal authority, Defendants argue that the FTC should be barred from dietary supplement cases due to the related authority wielded by the Food and Drug Administration ("FDA"). (*See* Motion at 12–15). Courts have repeatedly rejected arguments of this kind, recognizing instead that the FDA administers a distinct regulatory scheme that is inapplicable to the FTC Act. In *Bristol-Myers Co. v. FTC*, the Second Circuit concluded that "FDA requirements and regulations . . . simply do not govern this case." *See* 738 F.2d 554, 559 (2d Cir. 1984), *cert. denied*, 469 U.S. 1189 (1985); *see also Thompson Med. Co. v. FTC*, 791 F.2d 189, 193 (D.C. Cir. 1986) (stating that *Bristol-Myers* "made it quite clear" that FDA requirements and regulations were a different regulatory scheme and did not govern an FTC case), *cert. denied*, 479 U.S. 1086 (1987).

In *FTC v. Wellness Support Network*, a Judge in this District relied on *Bristol-Myers* to hold that "the degree of regulation [that the defendant's products] would be subjected to by the FDA simply is not relevant to the issues of this case." No. 10-cv-04879-JCS, Dkt. #155 at 17 (N.D. Cal. Oct. 4, 2013) (order on *Daubert* motion) (citing *Bristol-Myers*, 738 F.2d at 559); *WSN*, 2014 WL 644749, at *10 (reiterating order on *Daubert* motion); *see also FTC v. Lunada Biomedical, Inc.*, No. CV-15-3380-MWF, 2015 WL 12911515, *4–5 (C.D. Cal. Sept. 23, 2015) (holding that FDA law does not apply to FTC dietary supplement case).

The changes to the Food and Drug Act made by the Dietary Supplements Health and Education Act of 1994 ("DSHEA") had no effect on the FTC's authority over dietary supplements. As noted in the 1998 FTC Guide, DSHEA "significantly changed the FDA's role in regulating supplement *labeling*," but it did not alter the "long-standing FTC polices and enforcement practices relat[ing] to dietary supplement *advertising*." 1998 FTC Guide at 1 (emphasis added). The FDA makes the same point in parallel industry guidance: "Under

---
[8] https://www.ftc.gov/business-guidance/resources/health-products-compliance-guidance

[DSHEA], FDA has exclusive jurisdiction over the safety, and primary jurisdiction over the labeling, of dietary supplements. The FTC has primary jurisdiction over advertisements for dietary supplements." FDA, *Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r)(6) of the Federal Food, Drug, and Cosmetic Act* (Jan. 2009) ("FDA Guidance")[9]; *see also* Memorandum of Understanding Between Federal Trade Commission and the Food and Drug Administration, 36 Fed. Reg. 18539 (Sept. 16, 1971).

Overlapping jurisdiction is a common feature of federal law enforcement, and the existence of one agency's jurisdiction does not nullify other legal regimes addressing the same conduct. Congress and the courts have recognized the legitimacy of "overlapping agency jurisdiction under different statutory mandates." *FTC v. Texaco, Inc.*, 555 F.2d 862, 881 (D.C. Cir. 1977) (en banc). "[T]he cases recognize that ours is an age of overlapping and concurring regulatory jurisdiction." *Thompson Med.*, 791 F.2d at 192–93.

In any event, Defendants fail to identify any conflict, or even any inconsistency, between FTC and FDA enforcement of health claims for dietary supplements. To the contrary, the two agencies promote consistent standards in their respective enforcement programs. In its 2009 industry guidance, the FDA noted that DSHEA did not define "substantiation," and stated that it "intends to apply a standard . . . that is consistent with the FTC approach." FDA Guidance.

The FTC's approach to substantiation for health claims is also the subject of well-settled jurisprudence. The analysis begins by identifying whether the ads contain any "efficacy claims" or "establishment claims." *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015) (citing *Thompson Med.*, 791 F.2d at 194), *cert. denied*, 548 U.S. 965 (2016). Efficacy claims "suggest[] that a product successfully performs the advertised function or yields the advertised benefit, but include[] no suggestion of scientific proof of the product's effectiveness." *Id.* Establishment claims "suggest[] that a product's effectiveness or superiority has been scientifically established." *Id.* Here, the FTC has alleged that Defendants disseminated both efficacy claims (*see* FAC ¶ 53 ("COVID Resist/VIRUS Resist can treat, prevent, or mitigate

[9] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food

COVID-19")) and establishment claims (*see id.* ¶ 58 ("COVID Resist/VIRUS Resist is *scientifically proven* to treat, prevent, or mitigate COVID-19") (emphasis added)).

      For establishment claims, advertisers must possess the level of substantiation claimed in the advertisement. *WSN*, 2014 WL 644749, at *15. Efficacy claims must be supported by a "reasonable basis," and the specific level of substantiation required is determined using a set of "*Pfizer* factors." *POM Wonderful*, 777 F.3d at 123–24. The FTC has held "in general terms that the substantiation standard for health claims . . . for food products is 'competent and reliable scientific evidence.'" *In re POM Wonderful LLC*, 2013 WL 8364895, at *37 (F.T.C. 2013), *order modified & petition for review denied*, 777 F.3d 478 (D.C. Cir. 2015); *see also Daniel Chapter One v. FTC*, 405 F. App'x 505, 506 (D.C. Cir. 2010) (finding nothing unreasonable with FTC's requirement of competent and reliable scientific evidence, including clinical trials with human subjects). The FDA also advises firms to secure "competent and reliable scientific evidence" for dietary supplement ad claims. FDA Guidance.

      With the backdrop of this longstanding, well-accepted legal framework, Defendants' claim that they lacked "fair notice" (*see* Motion at 14) rings false. This is especially so because Defendants previously admitted to being aware of FTC authority over dietary supplements. In their May 5, 2021 letter to the FTC, Defendants claimed that their "statements are supported with *competent and reliable scientific evidence*" and that "[t]he products[] [they] sell are clearly in *compliance with the FTC*, DSHEA, and FDA's regulations." (FAC Ex. 1, at 4) (emphasis added). Moreover, in its May 18, 2021 response letter, the FTC sent Defendants a link to its 1998 Guide. (*Id.* Ex. 2, at 7); *see also Daniel Chapter One*, 405 App'x at 506 (holding that FTC's guide "gave notice that a reasonable basis for a claim concerning a dietary supplement consists of scientific evidence, including clinical trials").

## III.    CONCLUSION

      The Federal Trade Commission has express authority to bring this action, and its Complaint meets or exceeds applicable pleading standards. Defendants' other challenges—to the agency's structure, and to its authority over dietary supplement claims—are meritless. For these reasons, the FTC respectfully requests that the Court deny Defendants' Motion.

Dated: February 17, 2023                    Respectfully Submitted,


    /s/ Abdiel Lewis
ABDIEL T. LEWIS
EVAN ROSE
Federal Trade Commission
Western Region San Francisco
90 7th St., Suite 14-300
San Francisco, CA 94103
Tel.: (415) 848-5100

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION